We have Alvarenga, and Ms. Weiner? How'd that happen? I'm sorry. Are you? I think the switch. Yeah, let's. Sorry about that. It doesn't matter. Well. We can figure it out. Yeah. It was just disconcerting. I'm not Ms. Weiner. I took the first seat. I'm sorry. It's okay. Judge Beatty will tell you when we were assistants it mattered which side you were on. Good morning, your honors. May it please the court. My name is Jordan Weiner with American Friends Service Committee on behalf of Petitioner Edwin Alvarenga. I'd like to reserve three minutes for rebuttal. Of course. Go ahead, please. This case is about the immigration judge's one-sided consideration of the record and denying Mr. Alvarenga's application for protection under the Convention Against Torture. First, the immigration judge ignored evidence relevant to his likelihood of torture. Before I get into that evidence, I'd like to point out that this court held in Quinteros that ignoring evidence under prong one of Murie is legal error. This court also held in Liam that an immigration judge's failure to meaningfully consider the record or failure to meaningfully consider the immigration judge's selective consideration of the record is also legal error. What did she fail to consider? Great, I'll get right to it. She ignored that members of MS-13, the most violent and dangerous gang in the world, directly threatened Mr. Alvarenga. She found that there was no evidence showing he was likely to be tortured, but she also found his testimony credible and corroborated. And this is an internal inconsistency on its face. I'll repeat the same question. What evidence did she fail to consider? First, the direct threat. She failed to consider that MS-13 sometimes immediately carries out a threat, and sometimes there's a passage of time. Sometimes they wait, and there's many factors that go into this decision. I don't understand that. Is that record in the evidence? Yes, absolutely, Your Honor. No, no, no. So what I mean specifically is did someone say you should take into account that MS-13 sometimes waits? Now, MS-13 is unlike any criminal enterprise I've ever heard of because it's been 12 years. So help me on that. Yes, Your Honor. Dr. Bowerman, she found him to be an expert on gangs in Central America. He wrote a long and detailed report that provides conflicting evidence to every finding that the immigration judge relied on. And I could go point by point through the immigration judge's findings. Are you saying that the requirement is that if Dr. Bowerman made 10 points, then all 10 points have to be mentioned in the writing of the immigration judge? Your Honor, this court's decision in Liam is actually very instructive on when the immigration judge has to explicitly consider evidence, and that would include a situation where the evidence undermines her conclusion. And as I said, each finding has a specific evidentiary point in the record that conflicts with her conclusion. Well, she makes a point on page four of the 2021 opinion at the bottom of the page that there are all of these instances where the government of El Salvador has taken great steps to negate as best as it can. MS-13, you know, 373 arrests and indictments, et cetera, et cetera. I mean, clearly the IJ took into account the information that was presented about MS-13. Your Honor, what we have is one-sided consideration of the record. For example, she mentioned, yes, that 373 individuals have been prosecuted by officials in El Salvador, but she ignored the far greater number of tens of thousands of cases where the government couldn't protect those individuals, 20,000 people that the gangs killed around the same time period of those prosecutions, and over 70,000 people that were internally displaced. Why does that constitute acquiescence under MIRI Prong II? It goes toward willful blindness, and this court in Quinteros made clear that a government can acquiesce to torture despite opposing the groups that it harms. And the immigration judge made the same errors as the court did in Quinteros, where she relied only on the fact that the government was making some efforts and didn't take it a step further, which was to address whether the government was capable of protecting Petitioner. What does capable in this instance mean? What evidence is there that the government is not? Because the standard isn't to present evidence that the government would be successful in every attempt to protect every citizen. I mean, there's going to be crime. MS-13 is prevalent here as well as El Salvador. I mean, there are many people who are the victims of crime here as well. Yes, Your Honor, we have a spectrum. We have at one end of the spectrum the government making efforts and not being able to prosecute or protect an individual despite its best efforts. And then we have at the other end of the spectrum what the evidence shows here. Dr. Bowerman says that if Mr. Alvarenga were to file a police report, the police would be unable or unwilling to offer him even a modicum of protection. And he spends a significant part of his report explaining why that is. Yes, there's corruption at all levels of government, including with the president, who has been exposed directing and having high-level negotiations with gangs. But it's not just about corruption. It's about the combination of corruption with the power of the gangs, with the lack of will at the state level to protect vulnerable populations, and how all of that combines to cripple the institution of policing so that honest police officers aren't able to do their job. And it's not just how would the police respond to any Salvadoran citizen. It's how would the police respond to an individual who goes to them and says, the gang wants to harm me for informing on them. There's evidence in the record that the police would just view it as an inter-gang conflict. That's not worth their resources to get involved. And I could provide. Is that in the Bowerman opinion, or is that in the UNR? It's in Dr. Bowerman's opinion. UNHCR. AR-76. And so the immigration judge also. So as I mentioned, I could go through her findings and I could point out specific conflicting evidence to each of her findings. But I could also at this point move on to talk about the evidence she ignored and the likelihood. Your point is ignoring evidence. It's not the fact that there's conflicting evidence. It's both, Your Honor. It's ignoring evidence. And then what I meant to say earlier about when the immigration judge has to list everything out and when it's sufficient to just say she considered all the evidence. It turns on when the evidence is dispositive or is material to the claim. And so if she's going to be making all these findings for why he's not likely to face torture and there's evidence that conflicts, it becomes material at that point. And it's not enough for her just to say, like, oh, I've considered it. You know, this this decision doesn't show she's grappling with anything or grappling with each side. There's no on one hand. This is a powerful gang who's known for being vengeful, who's known for its institutional memory. Once one crosses it. I mean, it's just really it's quite a lengthy memory because we're talking about a time that stands more than a decade where, among other things, his family has resided without incident in the country. And and and where he was not so concerned by the one encounter that he reported back to the police. So part of the problem here seems to be that we're trying to figure out when does something cease being speculative and become sufficiently grounded that, as you say, the I.J. needed to meaningfully grapple with it. Why isn't this all just speculative part? Yes, Your Honor, perhaps with just a threat by an individual who's not affiliated with an international organization like this, the passage of time could bear more on reducing the likelihood of harm. But what we have here is evidence that this gang, its hallmark is not forgetting. It's part of its strategy of control. And to let Mr. Alvarenga just escape the consequences because he was out of the country for a while runs counter to the messages trying to send to the community that if you. But I don't understand about that particular point. Parate, I don't know how you pronounce it. It looks like pirate. I presume it's not pirate. So I'll say Parate. So Parate saw him here in the United States. Right. That confrontation was here. So, you know. He had access to your client and before your client was, I guess, rearrested in 16. Yes. 16. So between approximately 2013 and 2016. Your client was out. Parate was out. There is the threat, obviously, but nothing happened as far as I can see in the record. There's no follow up in that three year period. Yes, your honor. So so Parate, as I'll call him, held a knife to Mr. Alvarenga in the parking lot. It's unrealistic to expect that Parate would have just been ready to murder him in the parking lot. If that is what the immigration judge is getting at, because it was a surprise encounter for both of them. But Mr. Alvarenga moved immediately afterward. So to the extent there were no more confrontations, it's because Mr. Alvarenga was laying low and in hiding. He prevented an actual physical harm by leaving, by fleeing. Yes, your honor. Again, the record says he moved immediately. And also his claim, you know, as I mentioned in the brief, the claim is premised upon his fear of MS-13 in Salvador. And there's lots of record evidence that MS-13, that individuals can carry out threats in El Salvador that they can't in the United States. Well, that's what Borman said. He opined to that effect. Yes, your honor. You know, given the, I'm so sorry, go ahead. I was just going to ask about Borman, or however you say his name, Borman. We had him in another case. Is he known as an expert in El Salvador? Yes, your honor. He was the expert in Quinteros. And it's just coincidence. I'm referring to Quinteros because the errors that the immigration made are almost identical, both at the considering torture level and the acquiescence level. And it's the same expert. And it's because he's a known expert on Central American gangs. I'm a little troubled by the reference to Pirate and his approach. You know, given the reputation of MS-13, which you've alluded to, it seems odd that he would get a pass from Pirate. And certainly the IJ and the BIA in affirming can take that into account. It would seem that that kind of confrontation, the fact that your client went back to a warehouse that he had once worked with Pirate's brother, you know, at one time, these are all factors that the IJ put into her opinion that it seems pretty critical in trying to determine what will, you know, the likelihood of harm. Yes, your honor. With the little time, I want to make a very important point that he returned to the warehouse, but that is not where he met Pirate's brother. It's a little buried in the record, but he met Pirate's brother through a temporary job, it says. And so there's no connection. He did not meet Pirate through that job. And I wouldn't... No, no, I didn't say... I thought the record was not that he met Pirate through the job, but that Pirate's brother and he had worked there. And then he went back there when he came back to the United States. Is that not right? No, your honor. He was working at the warehouse where he met his later friend Wilmer. But the record is clear. He met Pirate's brother through a temporary job that was not the warehouse. And I would respectfully disagree that Pirate gave him a pass. He held a knife to him. And again, it was a surprise encounter. Even if Inmar was planning on killing him, it's very unlikely he could, you know, just, like, again, do it in the parking lot outside of a store. No, I mean, when I say pass, I mean, no physical confrontation. I mean, yes, he held a knife to him, but like nothing, nothing more. I mean, what we've heard about MS-13 is that those kind of confrontations don't necessarily end well, not necessarily taking of life, but other things. Yes, your honor. Two quick points. One, past harm is not required to show likelihood of future harm. The court in December held that. And also, Inmar had legal troubles. You know, we can't get into his mind. We don't know what he was thinking. But we know that Mr. Alvarenga's cooperation led to his arrest. So maybe he's on probation. He doesn't want to be beating people up in a parking lot. Like, you know, that's, we don't know why the issue he's in. But that's the maybes that make this tough to ground in the record as opposed to saying, yes, there's absolutely a speculative possibility that if then, but, all these things could happen. But what we're left with is a record that seems to show a long period of time where despite the sophistication that is represented in the record of the potential threat from the gang, nothing happened. Nothing happened that would rise to the level of torture or the acquiescence therein. So I do understand what you're saying, but I'm still having trouble understanding why it moves beyond the realm of speculation and the IJ's determinations. Yes, your honor. When deciding in fear-based claims past persecution, direct threats against an individual is a factor that weighs heavily toward future torture. And no, he didn't physically beat him. But yes, he threatened him in the parking lot. They threatened him in El Salvador. So our position is that the threat increases his likelihood of harm, even if he didn't directly physically harm him in the parking lot. As far as relief, you're asking for a remand for an opinion from the IJ ultimately with greater specificity? There's enough evidence to grant relief directly. This case has already gone down to the immigration judge level twice because of the immigration judge's errors under Miri the first time around. He's been detained for two years. If this goes back down again, it could be years more. However, we are happy to take remand with clear instructions, ideally to the court, that the immigration judge not repeat the same errors a third time. So your primary request for relief is reversal? Yes, your honor. And I see I'm out of time and I can answer more questions. Thank you. Good morning, your honors. May it please the court. Andrea Jeevis on behalf of the attorney general. This court should deny the instant petition for review because substantial evidence supports the agency's denial of cat protection. Ms. Jeevis, haven't we said that if the immigration judge is going to ignore or disregard evidence, she has to tell us why. Isn't that correct? Yes, your honor. But this is not a case where the evidence was ignored. How so? We have a 27-page, 120-paragraph opinion from Thomas Berman that concludes, based on my experience with gangs in El Salvador and understanding the facts of this case has provided to me, it is my professional opinion that Mr. Alvarenga would be at high risk of egregious physical harm and death if returned to El Salvador. Further, it's unrealistic to believe he would be able to successfully relocate internally or that the Salvadoran government would be able or willing to afford him even a modicum of protection. This comes from an expert on El Salvador, single-spaced, 27 pages. We have no idea what the immigration judge thought about this. She cherry-picked a couple of facts totally disregarding his opinion, never mentioning that he opines that passage of time without threats is not conclusive. They have institutional memory. The fact that just right after something that she cites, she cherry-picked it. She said, okay, X, and then the next two sentences totally go against what she's concluding. We have no idea what she thought about this opinion. Don't we have to ask her? I mean, maybe she's going to say, well, I've had him in cases and I've never found them credible. He doesn't know what he's talking about. You know, he pulls things out of the air. But to my mind, he's got some pretty strong things in here that support his conclusion. Why should we not send back and say, you have not told us what you make of this opinion? Because, Your Honor, the agency, both the immigration judge and the board, consider the expert opinion. The immigration judge on page 54 cites and discusses Borman's report. And, yes, that's one piece of evidence of the entire record. So the immigration judge considered the entire record. And what did she say about his opinion, that she discredits it for some reason? She used some points of his opinion. Exactly. She used some points, some facts that he notes. But she doesn't say, well, I don't believe his opinion is worth anything. Or she doesn't tell us what she thinks. She uses some of his facts. And then she uses all the other points of the record to find that the fear was speculative. The immigration judge talks about all of his past experiences and Dr. Borman's report and the country reports. This is a 1,200-page record. The immigration judge is not required to state an opinion on everything. It just has to consider the record as a whole, which she did. And going to the agency's position, she did reference Dr. Borman's report when she talks about how the family living in El Salvador and in the United States were not harmed, which is against what Dr. Borman's report says. She said they may be harmed. That's not a statement that, aha, if they're not harmed, then there really is no threat here. I mean, obviously they may be harmed. But if they're not harmed, is that evidence that, well, nothing serious is going on here? Well, I think it goes more to Dr. Borman's report. He talks about the gang tactics include beatings, attacks, rapes, and murders of the individual and of the family. It also talks, and that's on page 90. On page 91, his reports say the gangs associate target witnesses and their family members after the proceedings conclude. So the immigration judge used Dr. Borman's report and then took those notes into the case at hand, which his family has not been harmed. His family has not been threatened, either the family in El Salvador or the family in the United States. Is there any evidence that the family in El Salvador had to move as a result of his involvement as a cooperator? No, there's no evidence that they have moved or have had any issues with the gangs. As far as the record, I believe that the family is living in the same hometown. Because one of the instances when he returned to El Salvador was the incidents occurred outside his mother's home. And there's no mention of the family moving. And going to that point, this is a unique situation where we kind of know what happened. Petitioner was removed in 2011. He returned home to El Salvador. He went to his mother's home. He encountered gang members. He was threatened, as Judge Greenway mentioned. He never received any harm. He never received any harm in that instance. He was never physically harmed when a pirate threatened him with a knife. But he fled. He feared the harm, so he fled. He prevented himself from being harmed, didn't he, by leaving? Yes, he left. But then when he came to the United States, he had no harm here, either. Berman opined that, you know, that's understandable. They realize that they're going to be prosecuted in the United States. But in El Salvador, they can get away with it. Isn't that contained in his opinion? That was in his opinion. But the agency is looking at the record as a whole, and they found his fear speculative. The doctor never harmed him. His family never harmed him. The gang members never harmed him. This is a torture case. This is not a persecution case. The standard is higher in torture cases, and past torture is taken into consideration. I'm just not sure what to do with Berman's opinion, that he is at grave risk of serious harm if he's returned and that he won't be protected. I just don't know what to do with that. Well, I think as the agency did, you look at the record as a whole. There was no injury in El Salvador. There was nothing that happened in the United States. But Berman explains that, though. But Berman also said that the gangs target witnesses and family members, and they include beatings, attacks, rapes, and murders. None of that happened. Berman's report also said that the witness protection program in El Salvador is wholly inadequate. Petitioner is trying to use that witness protection program as the fact that he is not included in that as a factor in support of his case. So Berman's report isn't a 100% accurate situation. It's taken everything into consideration, as the agency did, and that is how the agency took all of Berman's report and the 1,200-page record and found that Petitioner failed the first prong of the Myrie test. There would not likely be torture. He failed the second prong of the Myrie test. The torture would not be inflicted with the instigation or consent or acquiescence of a public official. So the agency- What's the best evidence that he will be protected and that the government will do something to keep him from being harmed if he's returned? What's the best evidence cited by the immigration department? Well, there's two. If I could have two points, I'd say Berman's report talks about how in 2019, 373 prosecution and convictions of MS-13 members, and that's on page 84. The IJ cites to that on page 55. That's saying how El Salvador is making strides as being proactive. And then in this case, Petitioner never reported anything to the police, so we can't view that as either supporting or hindering the case. So we have to look at the evidence. Dr. Berman's report and also- Berman says they're basically in cahoots, the government and the gangs. But he also then has a fact that 373 prosecution and convictions, which is showing that they're making strides. There's also the United States 2019 state report, the police investigated and prosecuted crimes and human rights violations. Those are the two best evidence showing that El Salvador is making strides. In 2019, they were making prosecution and convictions. And Dr. Berman's- But what does prosecution and convictions have to do with their protecting of someone in his position? Well, the prosecution and convictions of the gangs, which is who he fears. So that's making strides. They aren't just letting people, you know, the gangs act without any prosecutions or convictions. They are trying to hold MS-13 accountable. How about the UNHCR, the UN Refugee Agency statement that the most the police are able to do is provide an escort out of the neighborhood for those who've received threats and that they have an inability to protect them in their homes or on the way to work? I think this would go back to the point of, yes, there's conflicting evidence in the record. And the agency had to view the record as a whole and make a decision. And again, Your Honor, I'd like to stick to the point that this is petitioner's burden of proof to show eligibility for protection. So this is petitioner having to show that he meets all both of my retests for likelihood of torture and acquiescence. How should we think about favorable evidence? So they make the argument that the IJ is disregarding favorable evidence. Now, favorable evidence is subjective. So I'm sure that there are pieces of evidence that the petitioner focuses on that the government might not think is so favorable. But tell us, with regard to this notion of disregarding favorable evidence, how should we think about it? Part of your response to Judge Rendell's questions is, well, you've got to look at the record as a whole. I think what the petitioner seems to be suggesting is there should be a sort of discreet, seriatim discussion of each piece, if you will, of favorable evidence. Tell us about how we should think about that and whether that's an approach that our precedent requires. Well, I think it goes to the conflicting evidence and the fact that this court shouldn't reweigh the evidence. That's the agency's decision. And as this court has said in previous decisions, the fact finder can be subject to second guessing, but this is a substantial evidence case. So the record petitioner must compel this court to reverse the decision and to find the other side. So, yes, you have to look at the evidence as a whole. You view the favorable and the non-favorable, and that's what the agency's position is. So the record has to compel a contrary conclusion. Yes. And it is petitioner's burden to show that he is eligible for cap protection, which he has not done in this case. He has not shown that there is a likelihood of torture, and he has not shown that if there was a likelihood of torture, that the El Salvadorian government or a public official would acquiesce to that torture. Well, I would assume that he, in offering Dr. Berman's report and his opinion, I'm assuming he is saying, well, this is weighty evidence to show that there is this likelihood and there is the probability of acquiescence. So, you know, you're saying that this report doesn't satisfy his burden, and that's my question. I asked the immigration judge, why does it not? And she cites that bit about the prosecution, but right after that, Berman says that that actually would be that prosecutions were laudable, but incarcerating gang members had actually strengthened the gang structures. And historically, even this type of successful prosecution has never translated to a diminishing of gang control over communities or enhanced security. So she took that idea of prosecution out of context in the opinion. I just want to ask her why, basically. I'm sorry, why she took that out of context and why she didn't tell us what she really thinks about the entire opinion of Berman as compared to pulling out things out of context. Well, when the immigration judge was looking at the record as a whole, she was reviewing the factors of the Myrie test and used what she needed from the record. She had to look at the record as a whole. And I think that's the best argument the government can give. There was a 1,200-page record from a lot of different sources, such as, you know, in the 2019 Human Rights Report, it says El Salvador took steps to bring formal officials to justice. They classified the gangs as terrorists. She cites that on page 56. So she's citing other evidence to support her conclusion, and she did consider Dr. Berman's report. She cites to it. She also talks about the International Crisis Group report that the laws in El Salvador are combating crime, disciplining police, deterring gang violence. And that's on page 468. So the immigration judge and the board viewed the record as a whole and reviewed the evidence, considered Dr. Berman's reports, but also considered the 2019 Human Rights Report and the International Crisis Group report in rendering its decision that Petitioner had failed to meet his burden for cat protection. And if there are any other questions, Your Honors? No. Thank you very much. Okay. Thank you. So your client cooperated twice, as I understand it, from the record. Is that right? Yes, Your Honor. Is it in the record the quantum of the cooperation? Like this, what I mean specifically is, you know, if I was cooperating against my colleagues, right, I mean, let's say, you know, he had stuff to say about Judge Mady, he had stuff to say about Judge Rendell, whatever. Right. I'll hide the fact. Right. I've got nothing on either of them except great things to say. But just play along with me. Is any of that in the record? Because here's why I'm asking. We know about the cooperation against Pirate, but we also know about the cooperation against El Doctor, right? And at least as far as I can see in the record, you know it so well, you're going to tell me if I'm wrong. I didn't see anything from El Doctor with regard to your client. So. Yes, Your Honor. The reason the brief focuses more on the cooperation with Pirate is the record is a little inconclusive, to what extent Doctor is affiliated with MS-13, if at all. And so we don't, it doesn't really weigh one way or the other in terms of our arguments. And so we're focusing on the cooperation with Pirate. And if you mean the degree to which he cooperated against Pirate, I could go through. No, that's not what I meant. Okay, but I could also talk about what he did with Doctor, if that's helpful. No. Okay. I mean, it's all helpful, but not really what I'd like to hear. What I was trying to figure out is, you know, there are cooperators that cooperate against two people and 200 people, or, you know, whatever. And I was just trying to figure out whether your client was, you know, a person who had given wide-ranging cooperation. I didn't get the sense that that was it, but I wanted to ask. Yes, Your Honor. If anything, the cooperation against Inmart, excuse me, against Doctor is ways toward likelihood of torture, because viewed in the aggregate, it's another possible reason that somehow it might trickle down to the gang. But mostly, I would consider it a neutral fact in this case. And I wanted to address a couple more points about the passage of time since the threat. I'm so sorry to interrupt. No problem. I beg your pardon. I don't think I got an answer to my question. So as far as we know, for MS-13 cooperation, it was against Pirate only. Yes, Your Honor. Okay. Thank you. Two points that help mitigate the passage of time since the threat. We know that the MS-13 members are from Mr. Alvarenga's hometown. They found him within a week of his arrival last time, and so they're likely to still be there and quickly find him again. Dr. Bowerman also talks about how fleeing can be considered an antagonistic act by the gangs. And the fact that he fled almost immediately after they threatened him also could put him at greater risk of harm. And I'd also like to respond to a couple of respondents' points about, again, these 373 prosecutions. As Judge Rindell pointed out, that same paragraph in Dr. Bowerman's report has conflicting evidence. He says it was already read, so I won't read it again, but just that the judge didn't view the entire paragraph in its entirety. Also, Dr. Bowerman talks about how these types of prosecutions, the success is short-lived, and it's never translated into greater security for these communities. Recent efforts by the government are a publicity tool, is what he says. And I would also go as far as to say that the government has pre-acquiesced and that Mr. Alvarenga was too scared to make a police report, and nor should he if making a police report could place him at greater risk of harm. And I will rest on that unless there's any more questions. Okay, thank you so much. So thank you, Ms. Weiner, and, of course, we thank the American Friends for their work on this.